UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Case No. 3:08 CR 27-LAC |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ROBERT L. IGNASIAK, JR., | ) | |
| | ) | |
| *Defendants.* | ) | |
| _____ | ) | |

## DEFENDANT'S SENTENCING MEMORANDUM

> ...But the first thing that I would like to say, Mr. Black repeatedly, over and over and over agin, talked about the fact that Mr. – Dr. Ignasiak is charged with drug trafficking. ***That's not true.*** I will read you one of the many counts, the 40 counts under Title 21, and I will tell you what he's charged with. He's charged with knowingly and intentionally dispensing, and causing to be dispensed, controlled substances.... ***That's what he's charged with, dispensing, not trafficking.*** I believe he has more than likely used that terminology to inflame you. ***It is not what he is charged with.***
>
> Prosecutor's Rebuttal Closing Argument, Transcript Excerpt, Day 16, October 29, 2008, at pp. 2-3 (emphasis added).

Contrary to the argument the prosecutor made to the jury to secure Dr. Ignasiak's conviction, he stands before the Court convicted of the same drug trafficking crime used to convict drug kingpins and Mafiosi who kill informants and law enforcement officers to protect their criminal enterprises, 21 U.S.C. §841(b)(1)(C). That statute and parallel Sentencing Guideline, if woodenly applied to Dr. Ignasiak, would mandate a sentencing similar to purveyors of crack cocaine. While the charges against him were certainly serious, the prosecutor's own argument to the jury

underscores that Dr. Ignasiak's conduct does not warrant the same measure of punishment as drug traffickers and Mafia leaders.  Nor is the Court bound to sentence him as such.  *See* Sentencing Transcript, *United States v. Dr. William Eliot Hurwitz*, Crim. No. 1:03cr467 (E.D. Va. July 13, 2007) (sentencing doctor convicted under 21 U.S.C. §841 of over-prescribing controlled substances to 57 months in prison), attached hereto as **EXHIBIT 1**.[1]

The Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), "has given judges an opportunity to rid the system of some of the worst aspects of guidelinism." *United States v. Jeross*, 521 F.3d 562, 587 (6th Cir. 2008).  While the Court must still consult the Guidelines to calculate an advisory sentencing range, 18 U.S.C. §3553(a)(4), "[d]istrict courts cannot just add up figures and pick a number within a narrow range. Rather, they must consider all of the applicable factors, listen carefully to defense and government counsel, and sentence the person before them as an individual."  *United States v. Ranum*, 353 F.Supp.2d 984, 987 (E.D. Wis. 2005).

The Supreme Court has now made clear that the sentencing range produced by the guidelines is just an "initial bench mark" or "starting point" in the sentencing process.  *Gall v. United States*, 128 S.Ct. 586, 596 (2007).  Indeed, this Court is "allowed to impose a sentence that varies from the Guidelines based solely on ... disagreements with the Guidelines," as long as the Court "state[s] the basis for [its] disagreement along with 'sufficient justifications' for 'the extent of the departure.'" *United States v. Cutler*, 520 F.3d 136, 163 (2d Cir. 2007) (quoting *Gall*, 128 S.Ct. at 594).  *See, e.g., Kimbrough v. U.S.*, 128 S.Ct. 558, 575 (2007) (holding that the district court did not abuse its discretion by sentencing defendant to 180 months instead of the advisory guideline range of 228-270

---

[1] Exhibit 1 is the transcript of Dr. Hurwitz's resentencing following the reversal of his conviction in *United States v. Hurwitz*, 459 F.3d 463 (4th Cir. 2006).

months because the crack cocaine/power guideline yielded "a sentence 'greater than necessary' to

achieve §3553(a)'s purposes, even in a mine-run case"); *United States v. Williams*, 435 F.3d 1350,

1355 (11ᵗʰ Cir. 2006) (per curiam) (affirming as "reasonable" a 90-month sentence for a crack

cocaine dealer where the guidelines called for a sentence of more than twice that amount, 188-235

months, where the district court concluded that a 90-month sentence was "sufficient, but not greater

than necessary" to punish, deter, and rehabilitate Williams, and the Eleventh Circuit held that this

finding was "reasonable" under the circumstances);[2] *United States v. Cani*, 545 F. Supp. 2d 1235

(M.D. Fla. 2008) (in heroin case, sentencing defendant to 60 months rather than within guideline

range of 262-327 months, because "[t]his Court does not believe that the sentencing range of 262-

327 months recommended by the Guidelines adequately complies with the purposes set forth in 18

U.S.C. §3553(a)(2) and believes instead that the Guidelines would impose a sentence far greater than

necessary");  *United States v. Parris*, 573 F. Supp. 2d 744, 754-55 (E.D.N.Y. 2008) (sentencing

defendants in security fraud case to 60 months in the face of an advisory guidelines range of 360 to

---

[2] The Eleventh Circuit has affirmed other downward deviations from the guidelines.  *See, e.g.,*
*United States v. Gray*, No. 05-15209 (11ᵗʰ Cir. June 28, 2006) (per curiam), *2006 U.S. App. LEXIS*
*16196*, at ** 6-7 (affirming a 72 month sentence for a child pornographer, whose guideline range
was 151-188 months, where the district court's sentencing findings "took into account Gray's age,
his prior minimal record and his medical condition"); *United States v. Halsema*, No. 05-13016 (11ᵗʰ
Cir. May 9, 2006) (per curiam), *2006 U.S. App. LEXIS 11563* (approving 24 month sentence where
guideline range was 57-71 months, based on district court's findings that a longer sentence would
negatively affect rehabilitation and the defendant had already suffered from his incarceration);
*United States v. Vawter*, 167 Fed. Appx. 101 (11ᵗʰ Cir. 2006) (per curiam) (affirming 6 month
sentence for bank fraud where guidelines called for a sentencing range of 24-30 months where
district court considered each of the factors in §3553(a));  *United States v. Montgomery*, 165 Fed.
Appx. 840, 843 (11ᵗʰ Cir. 2006) (per curiam) (affirming 8 month sentence for bank fraud where
district court considered each of the factors in §3553(a), and concluded that, based on the
defendant's "lack of a criminal history," she was "unlikely to commit further crimes in the future
such that she would need a lengthy period of incarceration to protect the public").

life).  *See generally Rita v. United States,* 127 S.Ct. 2456 (2007) (district court may consider arguments that "the Guidelines sentence itself fails properly to reflect §3553(a) considerations").

Instead of relying only on the guidelines, the Court must examine the factors set forth in 18 U.S.C. §3553(a), including: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public; (5) the need to provide the defendant with needed education or vocational training or medical care; (6) the kinds of sentences available; (7) the Sentencing Guideline range; (8) pertinent policy statements of the Sentencing Commission; (9) the need to avoid unwanted sentencing disparities; and (10) the need to provide restitution to victims.  *United States v. Talley*, 431 F.3d 784, 786 (11th Cir. 2005).

Unjustified reliance on any one §3553(a) factor "may be a symptom of an unreasonable sentence."  *United States v. Pugh*, 515 F.3d 1179, 1191-92 (11th Cir. 2008).  And, the sentence imposed must be "sufficient, but not greater than necessary, to comply with the purposes [of sentencing]." 18 U.S.C. §3553(a). Once determined, a sentencing court must adequately explain the sentence imposed, regardless of whether it is within or outside the advisory guideline range.  *Gall,* 128 S.Ct. at 597; *see United States v. McGee*, 494 F.3d 551 (6th Cir. 2007).

In anticipation of this Honorable Court's task at sentencing, Dr. Ignasiak submits this memo addressing certain mitigating factors within 18 U.S.C. §3553 (a).  Dr. Ignasiak has separately objected to various aspects of the Presentence Investigation Report ("PSIR") and incorporates those objections herein.  However, regardless of how the Court adjudicates his objections to the PSIR, Dr. Ignasiak requests a more lenient sentence based on the factors within 18 U.S.C. § 3553, which now

must guide this Court in imposing a sentence: Dr. Ignasiak's personal history and the nature of his offense call for a sentence far lower than the 292-365 months suggested in the PSIR.

### 1. The History and Characteristics of the Defendant

Dr. Ignasiak is 53 years old. He has been married to his second wife, Teresa, for 24 years. The couple has four children, Karissa, Robert III, Breigh (age 17) and Blayne (age 11). Robert III is in college but both Breigh and Blayne still live with their parents at their home in Freeport, Florida. Karissa is a real estate broker and lives in Mississippi.

Dr. Ignasiak has both BA and MD degrees from the State University of New York at Buffalo, and has been practicing medicine for approximately 29 years. For 20 of those years, 1985 to 2005, Dr. Ignasiak owned and operated the Freeport Medical Clinic, where the conduct at issue in the instant case occurred. During most of this same time period, 1987 to 2005, Dr. Ignasiak also served as the medical director of a nursing home, Walton County Convalescent Center in DeFuniak Springs, Florida, and served as the doctor for three other nursing homes. There have been no allegations that Dr. Ignasiak acted improperly in treating patients at the nursing homes.

Aside from his medical practice, Dr. Ignasiak was the Master at the Demoley Lodge in Buffalo, New York. He was a Junior Deacon in the Masonic Lodge in Freeport and is a lifetime member of the Lodge. Dr. Ignasiak was an Eagle Scout and in the past three years, he served as an assistant Den Leader in the Cub Scouts in South Walton County.

In his early years of medical practice in Freeport, Dr. Ignasiak was the team physician for the Freeport Highschool football team. He would perform physicals for free for the players. During the first Bush administration, Dr. Ignasiak served as a trustee for the Okaloosa Walton Community College. He did this for four years.

Dr. Ignasiak served one year as the chief of medicine at the hospital in DeFuniak Springs, now known as Healthmark.  He was a member of the Walton County Medical Society when it was active.  And for the last 15 years until his retirement, Dr. Ignasiak was the medical director of what was known as the Walton County Convalescent Center.

When Katrina devastated New Orleans, Dr. Ignasiak helped organize, collect, and purchase medical supplies and daily living supplies for the victims.  His wife Teresa and her dad then delivered these supplies to Katrina victims.

Dr. Ignasiak has no criminal record and, as a result of this case, has surrendered his medical and DEA licenses.  If the Court sentenced Dr. Ignasiak in the guideline range proposed by the Probation Officer, Dr. Ignasiak would not be released from prison until he was between 77 and 83 years of age.  Therefore, it is important to take into consideration Dr. Ignasiak's age in determining a just punishment.  A person is considered "elderly" for purposes of prison life when they reach the age of 50.  Indeed, some studies consider the age 40 to begin the range of an "older or elderly" inmate. *Elderly Jail Inmates, Problems, Prevalence & Public Health,* California Journal of Health Promotion, at 50 (2005)(citation omitted).  The every day stress, difficulties and isolation of incarceration could effect Dr. Ignasiak's health and life span. Accordingly, a just punishment should take into account Dr. Ignasiak's age and vulnerability.

### 2.  The Nature and Circumstances of the Offense, the Seriousness of the Offense and the Need for Just Punishment

Several of the Section 3553(a) factors overlap in that they urge a balance between the "seriousness" of the crime based on its inherent "nature" and the "need" for "just punishment."  As demonstrated below, the recommended guideline range greatly overstates the "nature" and

"seriousness" of the charges under the "circumstances" of this case, as well as the "just" nature of the recommended punishment.

Dr. Ignasiak's guideline range is so severe because he was convicted of committing the same crime, 21 U.S.C. §841, that is used against kingpins and purveyors of drugs that are *per se* illegal for **anyone** to distribute under **any** circumstances – drugs such as cocaine, Methamphetamine, LSD, PCP and marijuana.  Indeed, his guideline sentence is driven by subsection 841(b)(1)(C), which is used to enhance the sentences of crack traffickers who sometimes use guns to kill informants, law enforcement officers and bystanders, and which mandates a sentence of "not less than twenty years or more than life" if "death or serious bodily injury results from the use of" the controlled substance.  And, as the Probation Officer has indicated, the sentencing guidelines establish the Base Offense Level for such a serious crime at Level 38.  *See* U.S.S.G. §2D1.1(a)(3).

Although misuse of a medical license is "serious" in the abstract, sentencing doctors who prescribe controlled substances as drug traffickers under §841 overstates the seriousness of the offense under the "circumstances."  Indeed, the prosecutor herself, in her rebuttal closing argument, could not have said it better–

> ...But the first thing that I would like to say, Mr. Black repeatedly, over and over and over agin, talked about the fact that Mr. – Dr. Ignasiak is charged with drug trafficking.  ***That's not true.***  I will read you one of the many counts, the 40 counts under Title 21, and I will tell you what he's charged with.  He's charged with knowingly and intentionally dispensing, and causing to be dispensed, controlled substances.... ***That's what he's charged with, dispensing, not trafficking.***  I believe he has more than likely used that terminology to inflame you.  ***It is not what he is charged with.***

Transcript Excerpt, Day 16, October 29, 2008, at pp. 2-3 (emphasis added).

A career doctor convicted under §841 based on over-prescribing controlled substances is materially different from a career criminal trafficking in cocaine because most of the time, the doctor's conduct is legal and his patients have a right to treatment with controlled substances. Again, the prosecutor herself acknowledged in her rebuttal closing that some of Dr. Ignasiak's conduct was legitimate:

> Mr. Black just loves to get into individual problems, individual issues that these patients had. ***We have never said that [Dr. Ignasiak] didn't see any patients that had real medical problems. They absolutely did....*** [O]n an individual level, on an individual file level basis, you're going to be able to find what Mr. Black found. You're going to be able to find that there were initial – ***there were problems, physical problems, at least there were some listed, and some of them, some of them were backed up by testing....*** But in any event, you're going to find that there [were] some [tests] ordered. ***Nobody has ever come into this courtroom and said Dr. Ignasiak didn't doctor some of the time; that he was just a drug dealer in a white coat. Nobody has said that.*** And that's not something that we have to prove. ***It's not something that we have proved. It's not something that actually happened.***

Transcript Excerpt, Day 16, October 29, 2008, at pp. 7, 10 (emphasis added). Based on the prosecutor's arguments to the jury – arguments that successfully convince the jury to convict Dr. Ignasiak – the government should be estopped from now contending that Dr. Ignasiak was "just a drug dealer in a white coat."

"[A] party should not be permitted to abuse the judicial process by obtaining one recovery based first on affirming a certain set of facts and then another recovery based on denying the same state of facts." *DeSong v. Seaboard Coast Line R. Co.*, 737 F.2d 1520, 1522 n. 5 (11th Cir. 1984). Estoppel doctrines are directed toward those who "play 'fast and loose' with the courts" using "intentional self-contradiction ... as a means of obtaining unfair advantage in a forum designed for suitors seeking justice," *Scarano v. Central R. Co.*, 203 F.2d 510, 513 (3d Cir. 1953), those who blow "hot and cold as the occasion demands," *Allen v. Zurich Insurance Co.*, 667 F.2d 1162, 1167

n. 3 (4th Cir. 1982), and those who engage in "cold manipulation" of the judicial system. *Konstantinidis v. Chen*, 626 F.2d 933, 939 (D.C. Cir. 1980). Indeed, when the government employs "intentional self-contradiction" in a criminal case, it violates the principles of fundamental fairness embodied in the Due Process Clause of the Fifth Amendment. *See Drake v. Kemp,* 762 F.2d 1449, 1478-79 (11th Cir. 1985) (en banc) (Clark, J., concurring) (recognizing that the state's "flip flopping of theories" to "divide and conquer ... reduce[s] criminal trials to mere gamesmanship and rob[s] them of their supposed purpose of a search for truth"); *Smith v. Groose*, 205 F.3d 1045, 1051 (8th Cir.) ("the use of inherently factually contradictory theories violates the principles of due process"), *cert. denied*, 531 U.S. 985 (2000); *Thompson v. Calderon*, 120 F.3d 1045, 1055 (9th Cir. 1997) (en banc) (finding that a "prosecutor's use of fundamentally inconsistent theories" constitutes a form of "prosecutorial misconduct"), *rev'd on other grounds*, 523 U.S. 538 (1998). *See also United States v. Campa*, 459 F.3d 1121, 1178-79 (11th Cir. 2006) (Birch, J., dissenting). *Stumpf v. Mitchell*, 367 F.3d 594, 611 (6th Cir. 2004).

The government cannot have it both ways. It may not obtain "one recovery based first on affirming a certain set of facts" – *i.e.,* Dr. Ignasiak's conviction based on the argument that he was not charged with "drug trafficking" and that he was "not a drug dealer in a white coat" – and then come before this Court at sentencing, arguing that the drug trafficking statute does not overstate the seriousness of the offenses in this case.

In sentencing a physician to 57 months in prison for similar conduct, the Hon. Leonie M. Brinkema in *United States v. Dr. William Eliot Hurwitz*, Crim. No. 1:03cr467 (E.D. Va. July 13, 2007), recognized that "doctor" cases are different from the traditional drug trafficking case because, while such a doctor's practice may include many patients who are misusing the drugs prescribed, the

doctor's practice also includes "numerous individuals of impeccable backgrounds who were genuinely suffering from pain and who believed that Dr. Hurwitz had been the best thing that ever happened to them...." Sentencing Transcript, *United States v. Dr. William Eliot Hurwitz*, Crim. No. 1:03cr467 (E.D. Va. July 13, 2007), **EXHIBIT 1**, at p. 5. This Court will receive letters from former patients of Dr. Ignasiak that praise him in a similar fashion.

Another, related factor that makes doctor cases different is that while there is no dispute that the sale of cocaine is illegal for any purpose to anyone, there still exists a controversy in both the medical and legal professions about the use of opioids to treat chronic pain on a long term basis. As Dr. Ignasiak explained in detail in his pretrial motion to dismiss,[3] even the DEA has taken inconsistent positions on the use of opioids. And, while the medical profession and state agencies have attempted to provide guidelines, they provide no bright lines. Judge Brinkema based her lenient sentence of Dr. Hurwitz, in part, based upon the evolving, and still uncertain, standards in this area of medicine:

> And I will tell you that when I first got this case, as you know, I was not the original judge assigned to it, I had just read briefly what was in the newspapers and had read the Fourth Circuit opinion, the amount of drugs that Dr. Hurwitz prescribed struck me as absolutely crazy, and I couldn't believe the case even went to trial, and I must say for the record that the way in which the case was defended and in particular the testimony first of all of the government's own expert, Dr. Kennedy, and the two defense experts totally turned me around on that issue, and I think even by the end of the case, the government would admit that the mere prescription of high quantities of opioids in and of itself doesn't mean anything and that, in fact, there's an increasing body of respectable medical literature and expertise that supports those types of high quantities of opioid medication in the correct case where people suffer from legitimate pain issues. So this is a very different case than the one that was brought several years ago ***and has to be approached from a sentencing standpoint in that respect as well.***

---

[3] Dr. Ignasiak incorporates the arguments he made in his pretrial motion to dismiss on this point. *See* DE 67.

EXHIBIT 1, at p. 6 (emphasis added).  Judge Brinkema returned to this theme later in her sentencing,

noting that most of Dr. Hurwitz's practice involved–

> –legitimate patients suffering from real medical problems which he was attempting to treat with *a type of medicine that was clearly controversial but not illegal*, and that as time passed since the events in this case, more and more people in the medical community appear to be accepting high-opioid dosage as an appropriate approach, *it is still controversial, but it is clearly not per se criminal*, and there is an overwhelming evidence of the amount of patients who the doctor did help as well as evidence of patients who were injured by the doctor's behavior, but as I said earlier, *the line between criminal and malpractice or simply the fact that when extreme medications are used, people die*, most people in this room probably know cancer patients who have died in chemotherapy treatments.  Medicine is always dangerous.  Some people are more vulnerable to injuries from it than others.  *That doesn't turn a doctor's vigorous medical practice into criminal behavior*.

*Id.* at pp. 12-13 (emphasis added).

Judge Brinkema lighted one area in particular where the "line" was not always easy to

recognize – the treatment of patients who become addicted or have been arrested:

> Again, I think the government is wrong and myopic if it judges a doctor's practice or the legitimacy of it because of the number of convicted felons who are patients.  We've got former Cabinet officers walking around this country and all sorts of people who are convicted felons, and they've got as much a right to medical treatment as anybody else.  That should not be any kind of indicator of a practice having gone awry.
>
> ***
>
> Also, the line between illegal drug addiction and drug dependency because of drug treatment is a subtle line that needs to be more carefully addressed by us as a society, and the criminal justice system needs to be extremely careful in how it approaches that.[4]

---

[4] The line been dependency and true addiction is often difficult to determine because patients whose pain is not being adequately treated often exhibit addiction-like behavior, a term called "pseudoaddiction."  *See* David E. Weissman & J. David Haddox, *Opioid Pseudoaddiction - An Iatrogenic Syndrome*, 36 Pain 363 (1989) (pseudo-addiction is an "iatrogenic condition" in which a patient with genuine pain that has not been adequately treated manifests behaviors similar to patients with addiction disorders"). *See also* "*Frequently Asked Questions and Answers for Health*

(continued...)

I don't think there was any question during this trial that some of these patients, in order to have their pain alleviated, become drug dependent, but being drug dependent as part of a medical regime is not a crime.[5]

---

[4](...continued)

*Care Professionals and Law Enforcement Personnel*" (2004), at p. 4, Introduction ("The desperate search for pain relief, and the complex psychological disturbances accompanying chronic pain, may influence the phenomenology of drug use and greatly complicates the assessment of drug-related problems....").

[5]  *Dept. of Prof. Reg., Board of Medical Examiners v. Johnston*, Case No. 83-356, *1983 Fla. Div. Adm. Hear. LEXIS 6534* (January 9, 1984), at *13 ("It is ethical, and medically justifiable, for a physician to treat a patient who is already habituated or tolerant to Dilaudid, and who has chronic moderate to severe pain, for the purpose of relieving this pain, since the patient should be given relief from the pain"), *aff'd Johnston v. Dept. of Prof. Reg., Board of Medical Examiners*, 456 So.2d 939, 942 (Fla. 1st DCA 1984) (agreeing with the Hearing Officer that "prescribing Dilaudid to a patient who is already habituated or tolerant to the drug and who has chronic moderate to severe pain can be medically justifiable since the patient should be given relief from pain"); *Dept. of Prof. Reg., Brd. of Med. Examiners v. Manoyian*, Case No. 86-0995, *1986 Fla. Div. Adm. Hear. LEXIS 3647* (February 24, 1987), at *28 ("It may be appropriate and ethical for a physician to prescribe a Schedule II controlled drug to relieve a patient's pain even though the patient may have developed a tolerance to or dependence on the substance"); *Dept. of Health v.Franklin Sterling Miles*, Case Nos. 95-5558 and 96-3379, *1997 Fla. Div. Adm. Hear. LEXIS 5062* (August 1, 1997), at *6 (Hearing Officer agreeing with Dr. Miles that "[i]t is not unusual for patients experiencing severe pain to develop a tolerance" to such medication and, therefore, the dosage would be expected to increase); *Agency For Health Care Administration, Board of Medicine v. Najjar*, Case No. 94-5411, *1997 Fla. Div. Adm. Hear. LEXIS 5029* (February 5, 1997), at **14-15 (Hearing Officer finding that doctor's treatment of a patient with "concededly large does of multiple medications" was reasonable despite the patient's growing dependency on the medications); *Dept. of Health, Board of Medicine v. Najjar*, Case Nos. 97-3363 and 97-3442, *1998 Fla. Div. Adm. Hear. LEXIS 5543* (August 18, 1998), at **9-19, 37,  (doctor not guilty of inappropriate prescribing practices outside the course of his professional practice by issuing 30 prescriptions for pain management and depression that together with refills "exceeded 4,000 tablets" and where patient later died of multiple drug toxicity), *aff'd Dept. of Health v. Najjar*, Case No. 97-3363, 97-3442, *1998 Fla. Div. Adm. Hear. LEXIS 6092* (November 6, 1998), *aff'd Najjar v. Dept. of Health*, 754 So.2d 30 (Fla. 1st DCA 1999) (per curiam). *See generally* Russell K. Portenoy, *Opioid Therapy for Chronic Nonmalignant Pain: Clinicians' Perspective*, 24 J.L. Med. & Ethics 296, 300 (1996) ("physical dependence is an expected result of opioid therapy"); *Pain Undertreatment: "A Strikingly Large Problem," State Initiatives in End-of-Life Care (Last Acts*, Washington, D.C.), Issue 4, Apr. 1999, at 3 (physical dependence "is often perceived to be clinically unimportant as long as an abstinence syndrome [opioid withdrawal] is avoided")(quoting David Joranson, M.S.S.W., Senior Scientist and Director of the Pain Policy Studies Group at the University of Wisconsin);  Rima J. Oken, *Curing Healthcare Providers'*

(continued...)

*Id.* at pp. 42-43 (emphasis added).  Nor is it a crime, under Florida law, to continue treating a patient with opioids, even if the patient has become ***addicted*** or has an addiction history.[6]

---

[5](...continued)

*Failure to Administer Opioids in the Treatment of Severe Pain*, 23 Cardoza L. Rev. 1917, 1937 n. 104 (2002), (tolerance or the need for increasing doses of medication to maintain the same analgesic effect is viewed as a natural reaction to opioid use that may warrant increased doses of the medication), citing Brett R. Stacey, *Effective Management of Chronic Pain*, 100 Post Graduate Med. 281, 284 (Sept. 1996);  "*Frequently Asked Questions and Answers for Health Care Professionals and Law Enforcement Personnel*" (2004), at p. 15 (recognizing that it is "normal" for pain patients to become physically "dependent" on the drugs and that the medication would have "a decreasing effect over time" thereby requiring higher and higher doses to obtain the same level of relief but such "analgesic tolerance" did not mean the patient was "addicted" or had to stop taking the medication).

[6] *See Forlaw v. Fitzer*, 456 So.2d 432. 434 (Fla. 1984) (per curiam) ("[t]here is nothing inherently improper in prescribing drugs to a drug addict"); *Dept. of Health v.Franklin S. Miles*, Case Nos. 93-03264 and 95-03584, *1998 Fla. Div. Adm. Hear. LEXIS 5381* (January 19, 1998) (reversing Hearing Officer's finding in *Dept. of Health v.Franklin Sterling Miles*, Case Nos. 95-5558 and 96-3379, *1997 Fla. Div. Adm. Hear. LEXIS 5062* (August 1, 1997), that Dr. Miles's treatment was below the standard of care when he continued to treat patient "L.C." for pain even after L.C. informed Dr. Miles he was addicted and had previously been convicted of forging another doctor's prescriptions); *Dept. of Prof. Reg., Brd. of Med. Examiners v. Van Ore*, Case No. 83-2698, *1985 Fla. Div. Adm. Hear. LEXIS 4450* (January 9, 1985), at **28-30 ("it is also a physician's duty and obligation to try to relieve a patient's pain, including the use of Schedule II controlled substances.... It is appropriate and ethical to relieve a patient's pain with [controlled substances], even though the patient may have developed a tolerance or addiction to those substances" and "[i]t is medically justifiable for treatment to be performed solely for the purpose of relieving chronic moderate to severe pain in a patient..."), *aff'd Van Ore v. Brd. of Med. Examiners*, 489 So.2d 883 (5ᵗʰ DCA. 1983); *Dept. of Prof. Reg., Board of Medical Examiners v. Reese*, Case No. 83-0355, *1984 Fla. Div. Adm. Hear. LEXIS 4691* (May 12, 1984), at **7,12 (Hearing Officer finding that doctor properly treated 13 patients with controlled substances for pain even though most or all of them"had a history of prior alcohol or drug addiction or habituation problems"), *aff'd, Reese v. Dept. of Prof. Reg., Board of Medical Examiners*, 471 So.2d 601, 602 (Fla. 1ˢᵗ DCA 1985) (endorsing Hearing Officer who had "found that the drugs were prescribed in appropriate quantities and duration, were for medically justifiable purposes, and were not prescribed outside the course of appellant's medical practice").

A respected body of health care professionals agrees with this principle as well. *See* "*Frequently Asked Questions and Answers for Health Care Professionals and Law Enforcement Personnel*" (2004), at p. 8 (whether "addicted" or merely "dependent," the "goal" of pain treatment was "to reduce pain and suffering" and "[t]hese goals are the same for all pain patients regardless of addiction history"); *id.* at p. 25, Question 22 ("[i]t is within the scope of current federal law to (continued...)

To be sure, both Dr. Hurwitz and Dr. Ignasiak were convicted of "criminal" behavior that juries found went over the line.  But, the point Judge Brinkema was making is equally apt here. Since there is no "line" or "controversy" about the illegality of drugs like cocaine, the recommended guideline is appropriate.   For doctors convicted of over-prescribing drugs that are ***otherwise legal*** for them to prescribe, the "line" between what is legal and illegal is not always so clear because the use of opioids for the treatment of pain, while "controversial," is "clearly not per se criminal."

### 3. The "need for deterrence" and to "protect the public"

There is a plausible argument that the government could make that a lengthy incarceration is necessary to "deter" Dr. Ignasiak from becoming a recidivist.   As Judge Brinkema correctly perceived in analyzing this factor:

> The degree to which there is any danger of recidivism is zero in this case in my view, A, because of your age, B, because you are beginning to lose your eyesight ... [C] because you're going to lose your right to practice medicine, all of your licenses, and the Court will have you under supervision for a period of time. So there is no history — and [D] also, because of the way in which these offenses occurred, that is, in the nature of a medical practice, not on the street selling drugs, the normal concern we have about a drug distributor recidivating just is not here, and that is a factor the Court takes into consideration.

*Id.* at pp. 43-44.

---

[6](...continued)
prescribe opioids for pain to patients with a history of substance abuse or addiction");  Ada Jocox, *et al.*, *Management of Cancer Pain, Clinical Practice Guideline Number 9* (Agency for Health Care Policy and Research Pub. No. 94-0594, March 1994) ("nonopioid analgesic modalities should not be substituted for opioid analgesics to treat severe pain in patients who are suspected or known abusers of illicit substances").

While Dr. Ignasiak still has his eyesight, all of the other considerations mentioned by Judge Brinkema apply here.  Indeed, Dr. Ignasiak had already retired from practicing medicine before this case arose.

A study commissioned by the United States Sentencing Commission reveals that the older the offender, the less likely he or she is to commit another crime: "Recidivism rates decline relatively consistently as age increases.  Generally, the younger the offender, the more likely the offender recidivates."  U.S.S.C., *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines,* at 12 (available at <u>http://www.ussc.gov/publicatl</u> Recidivism_General.pdf).  *See also United States v. Carmona-Rodriguez,* No. 04 Cr. 667 (RWS), *2005 U.S. Dist. LEXIS 6254* (S.D.N.Y. April 11, 2005) (imposing a non-Guidelines sentence on a 54-year-old woman where, *inter alia*, there was a low probability of recidivism) (citing, in addition to other, omitted sources, the Sentencing Commission's study).  Dr. Ignasiak has no criminal history and his offense did not involve violence. His future is to remain a loving husband to his wife, a devoted father to his children and to serve his community.

### 4. The "respect for the law"

The Court may have concerns about the need to "send a message" to the medical community about the misuse of opioids.  Conversely, the vagueness of the medical – and, indeed, legal – standards surrounding the use of opioids for pain management have led health professionals to void concerns about the "inappropriate targeting of practitioners and patients for investigation and prosecution, and to excessive and unfounded fear of opioid use among patients and the public."  *Frequently Asked Questions and Answers for Health Care Professionals and Law Enforcement Personnel*" (2004), at p. 11, Question 6.  The DEA has acknowledged receiving complaints from the

15

medical profession about potential "chilling" effect borderline prosecutions would have on the legitimate use of controlled substances.  In response to this criticism,[7] the DEA published a "Policy Statement" in the Federal Register on September 6, 2006, stating that it was providing the Policy Statement to "dispel" fears of unjust prosecutions raised by the many complaints and comments it had received from the medical profession.  71 Fed. Reg. 52716.  Instead of providing meaningful guidance, however, the DEA claimed that federal courts had "long ago recognized that ***it is not possible*** to expand on the phrase 'legitimate medical purpose by a physician acting in the usual course of professional practice,' in a way that will provide definitive guidelines...."  *Id.* (emphasis added).[8]  The DEA further claimed that there "was a lack of consensus among physicians as to all the circumstances that warrant the use of opioids to treat pain" and that the medical profession needed to do "clinical trials" to resolve this "'controversy.'"  *Id.* at 52718.

A concern over the need to "send a message" to the medical community through the sentencing of a physician should be diminished where the DEA itself has acknowledged that it is "not possible" to draw concrete guideposts for physicians and where it has called for further research.  Any "message" the Court tries to send will inevitably be a mixed one.  The  "message" the Court may intend to send may end up deterring as many legitimate physicians as unethical ones. It is far

---

[7] For example, the American Pharmacists Association, in a statement presented to a Congressional committed, indicated that DEA's withdrawal of the FAQs and statements in the IPS about being free to investigate physicians whenever it sees fit had a chilling effect on the medical profession.  *See* Motion To Dismiss, Exhibit 18, American Pharmacists Association Statement to the House Government Reform Committee Subcommittee on Regulatory Affairs, September 13, 2005, Boston, Massachusetts.

[8] The DEA supported this assertion with a quote from *United States v. August*, 984 F.2d 705, 713 (6th Cir. 1992) ("[t]here are no specific guidelines concerning what is required to support a conclusion an accused acted outside the usual course of professional practice...").

easier to simply refuse to treat *any* patients with controlled substances – as indeed, Dr. Marholin did after he took over Dr. Ignasiak's practice – rather than risk an inaccurate guess as to where the DEA might later decide the line should have been drawn. Similarly, the Court will receive one letter from another Family Practice physician, Dr. Ruben Garcia, [Exhibit 2], who indicated that, to him, "[t]he arrest and conviction of Dr. Ignasiak sends a message to primary care doctors, and that is, if you feel compassion for your patients and if you put your trust in your patients' histories and intentions,[9] then you risk being arrested." As a result of this case, Dr. Garcia indicated that he has withdrawn his Class III DEA prescribing ability.

We respectfully submit that "respect for the law" is diminished, not furthered, if physicians feel, as a result of prosecutions such as this one, that the law is being applied so arbitrarily that they feel compelled to either under-prescribe, or refuse to prescribe at all, controlled substances – even when doing so would otherwise fall squarely within the standard of care. *See generally* Ashley Bruce Trehan, *Note: Fear of Prosecution: How the DEA Is Infringing on Patients' Right to Palliative Care*, 61 U. MIAMI L. REV. 961, 982 (April 2007) (discussing medical malpractice suit brought against a physician, in part, for under-treating the patient's pain).[10] Indeed, a physician in

---

[9] Dr. Garcia's views are consistent with those of the Florida Legislature that enacted a "Patient Bill of Rights and Responsibilities," *Fla. Stat. 381.026(6)*, which places the responsibility **on the patient** "for providing to the health care provider, to the best of his or her knowledge, accurate and complete information about present complaints, past illnesses, hospitalizations, medications, and other matters relating to his or her health." Section 381.026(6) likewise states that patients, not their physicians, are "responsible" for "following the treatment plan recommended by the health care provider" and "for his or her actions if he or she refuses treatment or does not follow the health care provider's instructions."

[10] "Typically, the goal of the physician treating such [a] patient suffering from chronic pain is to make the patient functional, with less pain." *Dept. of Health v. Franklin Sterling Miles*, Case Nos. 95-5558 and 96-3379, *1997 Fla. Div. Adm. Hear. LEXIS 5062* (August 1, 1997), at *11. Therefore,
(continued...)

Florida who refuses to treat intractable pain with controlled substance is directly violating Florida law. *See* Fla. Stat. 458.326(1) and (3) (providing that "[u]nder Florida law, ***notwithstanding any other provision of law***, a physician may prescribe or administer any controlled substance under Schedules II-V, as provided for in s. 893.03, to a person for the treatment of intractable pain....") (emphasis added).

### 5. Pertinent policy statements

In light of the Probation Officer's repeated references in the PSIR to patients of Dr. Ignasiak who began doctor shopping and other crimes, the policy statement in §5K2.10 for "Victim's Conduct" is particularly germane. Section 5K2.10 provides, in pertinent part, that "[i]f the victim's wrongful conduct contributed significantly to provoking the offense behavior, the court may reduce the sentence below the guideline range to reflect the nature and circumstances of the offense."[11] Relying on §5K2.10, Judge Brinkema reduced Dr. Hurwitz's guideline range by 5 levels, holding many of his patients were ultimately responsible for their own addictions and criminal behavior. Judge Brinkema noted that there was evidence during Dr. Hurwitz's trial of patients lying to him or

---

[10](...continued)
"[p]atients have the right to have their pain assessed and treated"). "*Frequently Asked Questions and Answers for Health Care Professionals and Law Enforcement Personnel*" (2004), at p. 15. And, the use of opioids to treat pain has been widely recognized "the cornerstone" of pain management. David E. Joranson *et al.*, *Trends in Medical Use and Abuse of Opioid Analgesics*, 283 JAMA 1710, 1710 (2000). *See also* Scott Fishman, The War on Pain 33-35 (2000); Daniel B. Carr & Leonidas C. Goudas, *Acute Pain*, 353 Lancet 2051, 2053 (1999) (opioids essential to treatment of acute pain); "*Frequently Asked Questions and Answers for Health Care Professionals and Law Enforcement Personnel*" (2004), at p. 11 ("[o]pioid therapy is accepted around the world" as "the most important approach to managing" not only acute pain but also "moderate to severe pain caused by ... life threatening diseases (such as AIDS)").

[11] Dr. Ignasiak is separately requesting a downward departure from his guideline range on the basis of §5K2.10.

18

making false police reports of stolen property in order to obtain more prescriptions from him.  *See* **Exhibit 1**, at p. 11.  Accordingly, she ruled: "I think, therefore, in the light of the behavior by those victims – and again, when I say 'victims,' these are the people for whom the jury has found the doctor guilty – requires that there be an adjustment to the offense level because of the wrongful conduct of the victims, and I find therefore that a significant reduction to the offense level is appropriate for those reasons."

This Court heard similar evidence in this case and, as noted above, the Probation Officer has erroneously treated the patients' criminal behavior as an aggravating factor when it should be a mitigating one.  The patients were all adults.  Addiction is no excuse for criminal behavior under our criminal justice system.  Indeed, taking personal responsibility for one's own addiction is one of the first steps in standard addiction therapy:

> Should drug users be held responsible for their decisions to use drugs? Should addicts be held accountable for other criminal acts that are undertaken either under the influence of drugs, or to serve the needs of drug acquisition? If addiction is a disease, shouldn't addicts be excused for their habits or for their actions, even otherwise criminal actions, that flow from their addictions?

> With respect to serious crimes, the law agrees with our general intuition: a condition of intoxication or addiction is not an excuse for criminal behavior. Nevertheless, many people are willing to be indulgent of less serious social indiscretions if the perpetrator had a bit too much to drink. "Chronic" addicts, however, often become unsympathetic characters – even compassionate social workers find themselves blaming the victim (the client or patient) when they deal extensively with junkies. Many treatment programs, including Alcoholics Anonymous, Narcotics Anonymous, and Gamblers Anonymous, explicitly adopt a disease perspective towards their respective addictions. Nevertheless, these programs do not absolve the addict of responsibility for his or her behavior – quite the contrary, they emphasize personal accountability. Even if biological conditions make drug use a nearly overwhelming necessity for some addicts, it is the drug use which is the necessity – not bank robbery or car theft or other crimes.

JimLeitzel, *Personal Responsibility and Addiction*, July 26, 2004, *reprinted on overlawyered.com/2004/07/personal-responsibility-and-addiction.htm*. Jan. 17, 2007. *See generally Powell v. Texas*, 322 U.S. 514 (1968) (Marshall, J., plurality op.) (rejecting defendant's claim that the disease of chronic alcoholism constituted a defense to the crime of "public intoxication" noting that the defendant was not convicted because he was an alcoholic, but because of his public behavior).

The letter Dr. Marholin sent to the Probation Officer in support of his request for restitution underscores why Dr. Ignasiak should ***not*** be punished for the intervening acts of third parties. The PSIR has presented the Court with a sanitized version of Dr. Marholin's claims.[12] His letter contains the unvarnished version where he lashes out even against HCA, accusing the HCA of "***intentionally*** placing me in harms way by misrepresenting the job opportunity." (Emphasis added.) He then accuses a Freeport pharmacist of being "***complicit*** in Dr. Ignasiak's operation." *Id.* (emphasis added). A radio host, William K Gast of *99 Rock*, also allegedly shares the blame for his alleged injuries. *Id.* Finally, Dr. Marholin notes, the one patient who allegedly threatened him was "mentally disturbed" and Dr. Marholin had him "Baker Acted." *Id.*

Dr. Ignasiak is not responsible for the "intentional" (allegedly) tortious acts of third parties. Nor is he responsible for the psychosis of a mentally disturbed patient or the paranoia of Dr. Marholin. Instead, two former patients of Dr. Ignasiak who have written to the Court, Tommy Reeves and Angela Roberts, [Exhibit 3], had it right when they told the Court, consistent with *Powell*, that the former patients who "have accused [Dr. Ignasiak] of wrong doing are the guilty

---

[12] In his objections to the PSIR, Dr. Ignasiak has objected to these and other allegations made by Dr. Margolin. As discussed in the text, his letter to the Court shows why Dr. Ignasiak's objections are valid.

ones, and should be the ones punished for the misuse of the medicine."  Judge Brinkema also had it right when she likewise found that the misconduct of Dr. Hurwitz's patients merited a significant *downward* adjustment, not an upward one, at sentencing. Dr. Ignasiak should be treated in a similar fashion.

### 6.  The Need for the Sentence to Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Correctional Treatment in the Most Effective Manner

As stated by one court, the goal of rehabilitation "cannot be served if a defendant can look forward to nothing beyond imprisonment . . . . A judge should be hesitant before sentencing so severely that he destroys all hope and takes away all possibility of useful life.  Punishment should not be more severe than that necessary to satisfy the goals of punishment." *United States v. Carvajal,* No. 04 Cr. 222 (AKH) (S.D.N.Y. Feb. 17, 2005), *2005 U.S. Dist. LEXIS 3076*, at *15-16.  The sentence recommended by the Probation Officer would truly "destroy[] all hope and take[] away all possibility" of Dr. Ignasiak ever having a "useful life" again.

### 7. The need to avoid unwanted sentencing disparities

An examination of reported decisions involving doctors sentenced for acting outside the course of their medical practices for prescribing controlled substances demonstrates that a wooden application of the guidelines in this context is excessive.  Prior to the sentencing guidelines, sentences in this area ranged from a $20,000 fine to seven years in prison. *See, e.g.,White v. United States*, 399 F.2d 813 (8th Cir. 1968) (**1 year**);  *United States v. Warren*, 453 F.2d 738 (2d Cir. 1972) (**5 years**), *cert. denied*, 406 U.S. 944 (1972); *United States v. Collier*, 478 F.2d 268 (5th Cir. 1973) (**$20,000.00 fine**);  *United States v. Rosenberg*, 515 F.2d 190 (9th Cir.l 1975) (**2 years**);  *United States v. Boettjer*, 569 F.2d 1078 (9th Cir. 1978) (**2 years**);  *United States v. Rosen*, 582 F.2d 1032

(5th Cir. 1978) (**5 years**);  *United States v. Kirk*, 584 F.2d 773 (6th Cir.) (**5 years**), *cert. denied*, 439 U.S. 1048 (1978);  *United States v. Rogers*, 609 F.2d 834 (5th Cir. 1980) (**7 years**);  *United States v. Hayes*, 794 F.2d 1348 (9th Cir. 1986) (**3 years**).  The one lengthy sentence (20 years) discussed in a reported decision during this time period was reversed as excessive.  *See United States v. Larson*, 507 F.2d 385 (9th Cir. 1974).

Most of the longer sentences mentioned in more recent reported decisions were the product of the now-discredited "mandatory" sentencing guidelines regime and were reversed for reconsideration in light of *Booker.  See, e.g., United States v. Feingold*, 454 F.3d 1001 (9th Cir. 2006) (144 month sentenced remanded in light of *Booker*); *United States v. Williams*, 445 F.3d 1302 (11th Cir. 2006) (life sentence remanded in light of *Booker*);[13] *United States v. Sawaf*, 129 Fed. Appx. 136 (6th Cir. 2005) (240 month sentence remanded in light of *Booker*).[14]  The 15 year sentence in *United States v. Chube*, 538 F.3d 693 (7th Cir. 2008), and the 20 year sentence in *United States v. Wexler*, 522 F.3d 194 (2d Cir. 2008), were  reversed, in whole or in part, for other reasons.  In several other guideline cases, there is no indication in the reported decisions that the sentences were ever appealed. *See, e.g., United States v. Merrill*, 513 F.3d 1293 (11th Cir. 2008) (life);  *United States v. Bek*, 493 F.3d 790 (7th Cir.) (41 months), *cert. denied*, 128 S.Ct. 549 (2007); *United States v. McIver*, 470 F.3d

---

[13] Williams died before he could be resentenced.  *See United States v. Williams, 2006 U.S.Dist. LEXIS 67579* (N.D. Fla. Sept. 2006).

[14] In *United States v. Tran Trong Cuong*, 18 F.3d 1132 (4th Cir. 1994), the defendant received a 97 month sentence but the conviction itself was reversed.

550 (4th Cir. 2006) (360 months), *cert. denied*, 127 S.Ct. 2276 (2007); *United States v. Katz*, 445 F.3d 1023 (8th Cir. 2006) (16 months), *cert. denied*, 549 U.S. 956 (2006).[15]

There are at least three conclusions that can be drawn from this analysis. First, there certainly is no need to adhere to the guideline recommendation in order to avoid "unwanted sentence disparities." Second, and on the contrary, it was the rigid misapplication of the Section 841 guideline to "doctor" cases that ***created*** a sentence disparity with what had been a consistently more lenient practice. Third, even in the guideline cases, sentences have ranged from 16 months to life. And, none of the reported decisions have analyzed the longer sentences under the post-*Booker* standards.

Finally, the comparison between Dr. Hurwitz's recent re-sentencing and this one are stark. On similar facts, Dr. Hurwitz received a 57 month sentence. The Probation Officer has recommended a sentence between five to seven times longer, 292-365.

### 8. The need to provide restitution to victims

Dr. Ignasiak's ability to provide restitution would be, if anything, harmed rather than furthered by what in all likelihood would be a death sentence, if the Court adopted the Probation Officer's recommendation. However, as discussed in Dr. Ignasiak's objections to the PSIR, the restitution claims made by some of Dr. Ignasiak's patients claim are meritless. None of the claims submitted to the Probation Officer are supported by medical records that would establish that Dr. Ignasiak was the proximate cause of their claimed injuries. Indeed, many of the injuries attributed

---

[15] In some cases, the sentences could not be determined from the reported decisions. *See, e.g., United States v. Alerre*, 430 F.3d 681 (4th Cir. 2005), *cert. denied*, 126 S.Ct. 1925 (2006); *United States v. Harrison*, 651 F.2d 353 (5th Cir.), *cert. denied*, 454 U.S. 1126 (1981); *United States v. Swurthwaite*, 590 F.2d 889 (10th Cir. 1979); *United States v. Badia*, 490 F.2d 296 (1st Cir. 1973).

to Dr. Ignasiak would not survive a motion to dismiss in a civil malpractice action.  One former patient, for example, blames Dr. Ignasiak for the fact that she was fired from her job as an LPN and lost her nursing license.  This patient is a drug addict who, to this day, has not taken personal responsibility for her own addiction or crimes.  She lied under oath at trial.  This patient even blames Dr. Ignasiak for her divorce, her "alienation" from her family and her inability to make her mortgage payments.  Similarly, another former patient, government trial witness Nadean Burke, demands $500,000 for unverified medical claims.  Moreover, Ms. Burke admits that she suffered a back injury from an automobile accident in 2001.  Dr. Ignasiak is not responsible for those injuries.  She and her personal injury attorney base their claims against Dr. Ignasiak on the allegation that he failed to make "a timely referral for Ms. Burke to be treated for the original back injury she sustained in the car accident...."  Such a claim is sheer speculation and the evidence at trial showed that Dr. Ignasiak repeatedly referred Ms. Burke to specialists, including one for back surgery.  Ms. Burke and her attorney then go on to blame Dr. Ignasiak for the malpractice of another doctor, Dr. Monk, who, as Ms. Burke's attorney notes, suddenly cut Ms. Burke's dosage of controlled substances "in half," despite knowing that she was addicted.  It is clear from Ms. Burke's submissions that it was **Dr. Monk's** decision to reduce the dosage that was the direct and proximate cause of her seizures and other medical problems.

These suspect restitution claims pose a larger issue.  The federal restitution statute was not intended to supplant civil medical malpractice standards by eliminating the "causation" requirement.  Judge Brinkema made this very point in sentencing Dr. Hurwitz:

> I made clear then [at trial] and I make clear again now that medical malpractice is a civil cause of action that anyone's been injured has a right to proceed with, but this is a criminal case that involves a much different set of issues, and I felt clearly that

24

those cases [patients of Dr. Hurwitz who died] where there might be a medical malpractice argument and there would be clearly arguments the defense could raise that would refute that but that it did not belong in the criminal case....

EXHIBIT 1, at pp. 5-6.

The types of restitution claims made by a handful of Dr. Igansiak's former patients likewise belong in a civil courtroom. The Plaintiffs' Bar should not be allowed to use restitution proceedings in criminal cases as a way of shortcutting the strict causation standards established by state legislatures and courts for medical malpractice cases. *See generally Posner v. Walker,* 930 So.2d 659 (3d DCA 2006).

## CONCLUSION

For all of the foregoing reasons, the Court should find that the 18 U.S.C. §3553(a) factors, as applied to Dr. Ignasiak's case, warrant a substantial downward variance from the guidelines since the guidelines seriously overstate the seriousness of the offense conduct under the circumstances of this case. Dr. Ignasiak does not deserve a sentence five to seven times longer than the 57 month sentence Dr. Hurwitz received. *United States v. Kathman*, 490 F.3d 520, 526 (6th Cir. 2007) (upholding 50% variance below the advisory guideline range); *United States v. Hussein*, 478 F.3d 318, 321 (6th Cir. 2007) (upholding one-day sentence, instead of a sentence withing the 37-46 month guideline range, for defendant charged with distributing 763 pills of Ecstasy); *United States v. Cooper*, No. 02-40069-01/02/03-SAC (D. Kan. Jan. 24, 2006), *2006 U.S. Dist. LEXIS 2582*, at * 89 (issuing 36 and 48 month sentences instead of sentences of 87-108 and 97-120 months under the sentencing guidelines because "the enhancements for the amount of loss in this case over-state the seriousness of the defendants' offenses"). *See also United States v. Cani*, 545 F. Supp. 2d 1235 (M.D. Fla. 2008); *United States v. Parris*, 573 F. Supp. 2d 744, 754-55 (E.D.N.Y. 2008).

**DATED** this  20th  day of   January  , 2009.

                       Respectfully submitted,

                       **BLACK, SREBNICK, KORNSPAN & STUMPF, P.A.**
                       201 South Biscayne Boulevard
                       Suite 1300
                       Miami, FL  33131
                       Tel: (305) 371-6421   Fax: (305) 358-2006

                 By:   _/s/ Jackie Perczek_____
                       **ROY BLACK, ESQ.**
                       Fla. Bar No. 126088
                       **JACKIE PERCZEK, ESQ**.
                       Fla. Bar No. 0042201
                       *Counsel for Robert L. Ignasiak, Jr.*

26

## SERVICE LIST

*United States v. Robert L. Ignasiak, Jr.*
Case No. 3:08-Cr-27-LAC

Michelle M. Heldmyer, Esq.
Michelle.heldmyer@usdoj.gov
Assistant U.S. Attorney
Northern District of Florida
21 East Garden Street
Pensacola , Florida 32502
Telephone: 850-444-4000
*Counsel for the United States*
(Service via CM/ECF)

Benjamin W. Beard, Esq.
Benjamin.beard@usdoj.gov
Assistant U.S. Attorney
Northern District of Florida
21 East Garden Street
Pensacola, Florida 32501
Telephone: 850-444-4000
*Counsel for the United States*
(Service via CM/ECF)

By:    */s/ Jackie Perczek*