# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF FLORIDA
# PENSACOLA DIVISION

UNITED STATES OF AMERICA,

v.                                                         Case No. 3:08cr27/LAC

ROBERT L. IGNASIAK,

_____/

# **O R D E R**

Before the Court is Defendant's motion for new trial (doc. 297) and motion for discovery (doc. 292). The Government has responded in opposition to the motions (docs. 305, 304).

These motions were filed as a result of the Government's filing a notice with the Court (doc. 274), disclosing that Dr. Arthur Jordan, an expert witness who testified at Defendant's trial, had been involved in a criminal matter in South Dakota which had not been disclosed to Defendant before or during trial.

The matter in question concerns Dr. Jordan's use of his credentials as a Special Deputy United States Marshal to board a commercial airliner with firearms, and the following facts were related by Assistant United States Attorney Benjamin W. Beard, who was one of the prosecutors at Defendant's trial. Although several times previous to the incident in question Dr. Jordan had traveled without any difficulty, in June of 2006 he attempted to board an airplane in South Dakota on a return flight from a personal trip he had taken with his wife. It was a condition of Dr. Jordan's appointment as a deputy that he only exercise his authority when "in furtherance of the mission for which he has been specially deputized." Dr. Jordan indicated on the airport security disclosure form that he was on official government travel, but an airport security agent discovered that he was not. The agent also learned that Dr. Jordan's deputy badge was not officially issued but had been independently purchased on the internet.[1] Dr. Jordan was evidently held for a time at the airport and questioned, but he was released in time to catch the next available flight home.[2]

In lieu of criminal charges, the South Dakota United States Attorney's Office allowed Dr. Jordan to enter into a "pretrial diversion agreement" whereby he agreed to pay a $2,000.00 fine to the Transportation Safety Administration and to not carry a concealed weapon for six months unless he was on official duty. Because Dr. Jordan complied with the terms of the agreement, no charges or other official actions were taken against him.

---

[1] Dr. Jordan had a separate coroner's badge which was officially issued.

[2] Dr. Jordan's firearms, together with his ammunition, handcuffs, knife and police baton, were confiscated from him. These items were later returned to him.

As part of AUSA Beard's pretrial interviewing of Dr. Jordan, Beard asked him if he had ever been convicted of any felonies or crimes of dishonesty, and Dr. Jordan answered that he had not. Beard relates that there was nothing in Dr. Jordan's background information that might indicate any concerns along these or require further inquiry, and a check of the National Crime Information Center ("NCIC") database revealed nothing. Beard does relate, however, that he met with Dr. Jordan on the eve before Dr. Jordan was due to testify at trial:

> During that discussion, [Beard] again asked if there had been any criminal charges of any kind lodged against Dr. Jordan. Dr. Jordan answered that there had not. He volunteered that there had been an embarrassing misunderstanding "at an airport," earlier in his life, without giving specifics. [Beard] asked whether the incident had led to any charges being lodged or whether charges were being contemplated. He answered no and [Beard] went on to other matters.

Doc. 274, ex. 1 at 2-3 (affidavit of AUSA Benjamin W. Beard).

Several months after trial, Beard received a telephone call from an Assistant United States Attorney in Boston, asking whether Beard was familiar with a "legal problem" Dr. Jordan might have had in South Dakota. *Id.* at 3. Beard subsequently consulted with the South Dakota FBI office, learned of the incident described, and reported it in his Notice to the Court.

Defendant filed his Motion for New Trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure, based upon the fact that the airport incident with Dr. Jordan had not been disclosed to the defense at the time of trial. Defendant founds his claim under the well-familiar holding in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963),

which requires the government to make available to criminal defendants all exculpatory evidence material to guilt or punishment that is in its possession. Defendant also raises *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), which prohibits the government from knowingly offering into evidence the false testimony of a witness. Although Defendant recognizes that the diversion agreement could not have been used as impeachment evidence, he maintains that it would have been admissible to show a pro-government bias on the part of Dr. Jordan and as evidence of his untruthfulness under Rule 608(b) of the Federal Rules of Evidence. In his motion for discovery, Defendant requests additional information regarding Dr. Jordan's deputy status, the airport incident and the resulting diversion agreement, as well as any notes or reports maintained by Beard relevant to Dr. Jordan's mention of the "embarrassing misunderstanding" at the airport.

Under *Brady*, the prosecution's withholding of evidence favorable to an accused violates due process irrespective of the good faith or bad faith of the prosecution. *See Strickler v. Greene*, 527 U.S. 263, 280-81, 119 S.Ct. 1936, 1948 (1999). Instead, the objective inquiry is upon whether the prosecutor had knowledge of or reasonably had access to the information and its exculpatory nature. This knowledge or access to knowledge extends beyond the prosecutor to the entire "prosecution team," including investigative personnel and others acting on the government's behalf on the case. *See Kyles v. Whitley*, 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); *United States v. Meros*, 866

F.2d 1304, 1309 (11th Cir. 1989). The "prosecution team" includes all those over whom the prosecutor has authority. *See Moon v. Head*, 285 F.3d 1301, 1309 (11th Cir. 2002).

As far as separate agencies of the government, courts should look to the facts of each case to determine whether information possessed by one agency should be imputed to another. *Id.* Still, there should be some connection between the agencies other than the fact that they are both part of the same organizational tree. Where for instance the two agencies are part of the same investigative task force, a sufficient connection may be established. *See United States v. Antone*, 603 F.2d 566 (5th Cir. 1979). Absent such a connection, the prosecution should not be required to conduct "fishing expeditions" in search of information that might possibly be housed in other agencies with no apparent relevance to the case at hand. *See Moon*, 285 F.3d at 1309-10 (collecting cases). "[T]he imposition of an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office on the case in question would inappropriately require us to adopt a monolithic view of government that would condemn the prosecution of criminal cases to a state of paralysis." *Id.* (quoting *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998)).

Correspondingly, the prosecution's duty to reasonably gain access to relevant information would ordinarily include the routine search of databases such as the NCIC. *See United States v. Auten*, 632 F.2d 478 (5th Cir. 1980); *United States v. Jones*, 34 F.3d 596, 599-600 (8th Cir. 1994). Certainly other, particular databases should be perused if warranted under the situation, *see United States v. Perdomo*, 929 F.2d 967, 970 (3d Cir. 1991)

(prosecution consulted NCIC database but failed to search the local Virgin Islands files which were not part of the NCIC), but absent such an apparent need, *Brady* does not require prosecutors to search databases that are beyond their jurisdiction, or that are otherwise unrelated, on the off-chance that something might turn up. *See United States v. Joseph*, 996 F.2d 36, 41 (3d Cir. 1993); *see also Meros*, 866 F.2d at 1309 (prosecutor in Florida district not expected to have access to favorable information known to prosecutors districts in Georgia and Pennsylvania).

Under the facts of this case, the Court finds no basis from which to conclude that the Government knew of or had reasonable access to information relevant to Dr. Jordan's legal incident at the airport or his subsequent diversion agreement. AUSA Beard checked Dr. Jordan's background as part of the ordinary course of trial preparation and found nothing. Neither the state of South Dakota nor its governmental agencies were in any way connected with this case; thus, there was no impetus to cause Beard or anyone on the prosecution staff to open any sort of investigation in that state. Moreover, because the nature of the diversion agreement is to allow an individual to be penalized for a wrongdoing without formal charges being levied, it is not even certain that a routine search in South Dakota, via database or otherwise, would have born fruit.[3] While courts have recognized that the need to search for information in particular areas can arise when the defense makes a special request for information or background on a witness, *see, e.g., Joseph*, 996 F.2d at 41, no such request

---

[3] As the government asserts, each district office of the United States Attorney stores and maintains its own pretrial diversion agreements.

was made as to Dr. Jordan. In fact, the opposite is true: the Defendant during pretrial discovery requested only scientific examinations or test results, steadfastly declining to ask for the Government's experts and their opinions, apparently in order to avoid divulging their own experts.

Beard acknowledges that, on the eve before Dr. Jordan was to testify, he mentioned the "embarrassing misunderstanding" at the airport to Beard. However, Beard responded by asking Dr. Jordan if there were any criminal charges involved, and Dr. Jordan answered in the negative. While Beard was in retrospect able to "connect the dots" between this pretrial meeting and the later revelations about the airport incident, the Court does not view the scant information that Beard was presented with before trial as sufficient to induce him to perform a full scale search of Dr. Jordan's background, particularly since Dr. Jordan stated that no criminal charges were brought. Nor, for that matter, would there be any sort of guarantee that such a search would have been successful.

In his motion for discovery, the Defendant primarily requests additional information regarding the incident and more background on Dr. Jordan, but this information is superfluous given the Court's finding that the government had no knowledge of the incident in the first place. The Defendant also requests more information regarding the conversation that took place between Beard and Dr. Jordan on the night before he was to testify, but since Beard's affidavit provides the pertinent facts regarding the conversation, little would come of this discovery request beyond a repetition of what was already stated in the affidavit.

Accordingly, it is **ORDERED:**

1. Defendant's Motion for New Trial (doc. 297) and Motion for Discovery (doc. 292) are **DENIED**.

**ORDERED** on this 1st day of March, 2010.

                                                s/ *L.A. Collier*
                                                Lacey A. Collier
                                       Senior United States District Judge